IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CELESTE A. PUPPOLO, personal
representative of the estate of NANCY
PUPPOLO

       Plaintiff,

v.

LOWELL J. GORDON
17 West Jefferson Street
Suite 200
Rockville, Maryland 20850

       Defendant.

Case No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Celeste A. Puppolo, personal representative of the Estate of Nancy V. Puppolo,

files this complaint and demand for jury trial against Lowell J. Gordon, Esq. ("Mr. Gordon"),

and in support therefor, states as follows.

## THE PARTIES AND VENUE

1. Nancy V. Puppolo was a resident of the State of Massachusetts.

2. Upon her death, Celeste Puppolo opened an estate within the State of Massachusetts and is

the personal representative of the estate.

3. Mr. Gordon is a resident of the State of Maryland.

4. Federal diversity exists pursuant to 28 U.S.C. §1332 because Plaintiff is a resident of the State of Massachusetts, the resident State of Nancy V. Puppolo, and Mr. Gordon is a resident of the State of Maryland, and the matter in controversy exceeds $75,000.

## FACTUAL BACKGROUND

5. On August 12, 2006, Mrs. Nancy V. Puppolo ("Mrs. Puppolo") developed a bad cold, and her speech became slurred.

6. Mrs. Puppolo was brought to Washington Adventist Hospital for treatment.

7. Sabyasachi Kar, M.D. ("Dr. Kar") attended and treated Mrs. Puppolo.

8. Dr. Kar admitted Mrs. Puppolo to the Medical/Surgical Telemetry Unit, ordered an MRI and requested a neurologist to evaluate her condition.

9. Dr. Kar prescribed Lovenox and administered Coumadin.

10. A neurologist subsequently attended to Mrs. Puppolo and confirmed Dr. Kar's treatment plan.

11. The following day, Shahid Shamim, M.D. ()"Dr. Shamim") also began treating Mrs. Puppolo.

12. Along with the attending neurologists and other treating providers, Dr. Shamim and Dr. Kar cared for Mrs. Puppolo while she remained at Washington Adventist Hospital.

13. On August 12, 2006, Washington Adventist Hospital started Mrs. Puppolo on the blood thinner Lovenox at 40 mg twice per day.

14. This level of dosage was double the amount that was prescribed/used during Mrs. Puppolo's brief admission to Adventist in July, 2006 and is in excess of commonly prescribed dosages for most patients.

15. Lovenox is a blood thinner (anticoagulant) used to treat strokes and is known to increase the severity of intracranial bleeding.

16. On August 13, 2006, at approximately 11:45 a.m., and again at approximately 4:00 p.m., Mrs. Puppolo's brain was scanned using a magnetic resonance imaging (MRI) procedure. Washington Adventist Hospital medical staff anticipated that Mrs. Puppolo may not remain completely immobile during these procedures.

17. Because Mrs. Puppolo was initially shaking during the MRI scan on August 13, 2006, Washington Adventist Hospital, by and through its agents and/or employees, aborted the review and reporting of said MRI results.

18. Assuming that the MRI images of August 13, 2006 would be of poor quality, Washington Adventist Hospital did not analyze them for use in assessing Mrs. Puppolo's medical condition even though images were generated from the scans.

19. The MRI images taken in the afternoon on August 13, 2006 were, in fact, clearly readable and showed intracranial (within the skull) bleeding along with evidence of acute stroke. Large strokes are frequently accompanied by intracranial bleeding.

20. Mrs. Puppolo was seen by an occupational therapist on August 13, 2006, and by a hospitalist on August 14, 2006, both of whom were agents and/or employees of Washington Adventist Hospital.  Both the therapist and the hospitalist noted obvious symptoms of a large stroke on

the left side of Mrs. Puppolo's brain.  These symptoms included obvious right facial droop, muscle weakness on the right side of her body (hemiparesis), and a tendency to ignore the right half of her space (hemineglect).

21. On August 15, 2006, Adventist took further brain images of Mrs. Puppolo.  These images showed clear evidence of previous bleeding in the left brain hemisphere and the possibility of acute bleeding in the other sections of the brain.  The report from this MRI indicated in bold language that the possibility existed of intracranial bleeding.

22. At this juncture, the standard of care required that the administration of Lovenox should have been immediately terminated, based upon the obvious evidence of a large stroke and intracranial bleeding discussed in the preceding paragraphs, and the resultant possibility of life-threatening acute bleeding.

23. However, Washington Adventist Hospital, in spite of the aforesaid evidence of acute stroke and/or intracranial bleeding, continued to administer Lovenox to Mrs. Puppolo, without interruption, at the same twice-daily 40 mg dose.

24. The Lovenox dosages, as prescribed and administered by Adventist, by and through its agents and/or employees, were the proximate cause of a massive intracranial hemorrhage Mrs. Puppolo suffered on August 19, 2006, which, in turn, caused her to lapse immediately into a coma.

25. On August 20, 2006, Washington Adventist Hospital imaged Mrs. Puppolo's brain again through MRI scans, and massive, life-threatening hemorrhaging was observed.

26. On August 20, 2006, Washington Adventist Hospital finally ordered a discontinuation of all

4

anticoagulants, including Lovenox.  Mrs. Puppolo was ultimately transferred via helicopter to the University of Maryland R. Adams Cowley Shock Trauma Center for emergency neurosurgery to address her extensive intracranial bleeding.

27. The previous doses of Lovenox prescribed by Washington Adventist Hospital for Mrs. Puppolo exceeded the typical or average dose even for patients that had no intracranial bleeding.

28. Even a "typical" dose of Lovenox would not have been appropriate for Mrs. Puppolo and would have violated the standard of care, given the evidence described previously of her acute stroke and intracranial bleeding.

29. By and through its agents and/or employees, Washington Adventist Hospital administered to Mrs. Puppolo 40 mg of Lovenox once on August 12, 2006, twice daily on August 13 through August 19, 2006, and once on August 20, 2006.

30. On August 20, 2006, for the first time, Washington Adventist Hospital administered medication to Mrs. Puppolo in an attempt to reverse the adverse effects of the Lovenox.

31. On August 20, 2006, as stated above, Mrs. Puppolo was transferred via helicopter to a shock trauma center for neurosurgery to repair her extensive intracranial bleeding.

32. Mrs. Puppolo remained in a comatose state for the next six weeks until she awakened and was ready for rehabilitation.

33. Between August 20, 2006 and June 27, 2007, Mrs. Puppolo suffered from severe complications of her hemorrhage, coma, and extended hospitalization.  These complications

included but were not limited to the following: multiple surgeries, hospital acquired bacterial infections, massive bedsores on her lower back and right heel that ultimately led to persistent surgeries and toe amputations, numerous bodily contusions, multiple instances of hypoglycemic shock, lung collapse, sepsis accompanied by systemic inflammatory response syndrome (SIRS), renal failure, conscious pain and suffering, and other physical damages to her body.

34. On August 12, 2009, Plaintiff, through counsel, filed a claim with the Maryland Health Care Alternative Dispute Resolution Office (HCADRO") against Washington Adventist Hospital and Dr. Kar alleging medical negligence.

35. Plaintiff, through counsel, filed a certificate of merit and report prepared by Joseph Jeret, M.D., a neurologist.

36. The parties waived out of arbitration.

37. Plaintiff, through counsel, filed a complaint in the Circuit Court for Montgomery County.

38. Plaintiff, through counsel, alleged that Mrs. Puppolo had received an excessive amount of Lovenox and that the medical providers failed to diagnose a stroke and intercranial bleeding in a timely matter.

39. Plaintiff, through counsel, also alleged that Mrs. Puppolo suffered injury as a result of the medical negligence.

40. Washington Adventist Hospital moved to dismiss alleging a deficient certificate of qualified expert and report.

41. Washington Adventist Hospital's motion was granted.

42. On March 29, 2011, Plaintiff, through counsel, filed a second complaint against Washington Adventist Hospital in the Circuit Court for Montgomery County.

43. Washington Adventist Hospital filed a motion to dismiss alleging, among other things, that Plaintiff, failed to file the new claim with HCADRO before filing it with the Circuit Court for Montgomery County.

44. Washington Adventist Hospital also filed a motion for summary judgment, arguing that Plaintiff did not identify any expert witnesses in accordance with the court's scheduling order.

45. Plaintiff, through counsel, had filed an opposition to the motion to dismiss, but failed to file an opposition to the motion for summary judgment.

46. The Court granted both of Washington Adventist Hospital's motions.

47. Dr. Kar then filed multiple motions to strike Mrs. Puppolo's medical expert, arguing that a neurologist could not be a qualified expert with respect to Dr. Kar.  His motions to strike were denied.

48. On March 26, 2012, Dr. Kar filed a motion to dismiss and a motion for summary judgment asserting that Mrs. Puppolo's expert was not qualified to testify as to the standard of care regarding Dr. Kar.

49. The Circuit Court initially denied Dr. Kar's attempts to strike Plaintiff's expert.

50. Dr. Kar filed a motion to reconsider.  Notwithstanding that the Circuit Court had previously

denied Dr. Kar's attempts to strike Plaintiff's expert witness, Plaintiff's counsel, Mr. Gordon, erroneously conceded on the record that Plaintiff's expert was not qualified to opine on the standard of care of Dr. Kar.

51. Plaintiff appealed the judgments of the Circuit Court; however, the judgments were affirmed.

COUNT I

(Professional Negligence)

52. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully in this Count.

53. At all times relevant to this Complaint, Plaintiff retained Mr. Gordon and Mr. Gordon agreed to represent Plaintiff in connection with the actions against Dr. Kar and Washington Adventist Hospital.

54. Standards of care prevail under which Mr. Gordon is required to practice.

55. Mr. Gordon breached the standard of care when he failed to re-file the claim against Washington Adventist Hospital with HCADRO.

56. Mr. Gordon breached the standard of care when he failed timely to identify experts as to Washington Adventist Hospital.

57. Mr. Gordon breached the standard of care when he failed to file a response to Washington Adventist Hospital's motion for summary judgment.

58. Mr. Gordon breached the standard of care when he failed to advocate for Plaintiff and erroneously conceded that Plaintiff's expert was not a qualified expert

59. Mr. Gordon breached the standard of care when he failed to replace the expert identified to

testify as to the standard of care of Dr. Kar with an expert who he believed was qualified to testify as to the standard of care of Dr. Kar.

60. As a direct and proximate result of the negligence of Mr. Gordon, Plaintiff suffered significant damages.

WHEREFORE, Plaintiff seeks compensatory damages in the sum of Two Million Dollars ($2,000,000) plus an award of all costs and any other relief the court deems appropriate.

Dated: December 2, 2014                              Respectfully submitted,


_____/S/_____
Thomas O'Toole, Trial Bar 10227
Baroody & O'Toole
201 North Charles Street, Suite 2102
Baltimore, Maryland 21201
(410) 539-8413 (telephone)
totoolelaw@aol.com (email)
(410) 539-8411 (facsimile)
Attorney for Plaintiff


DEMAND FOR JURY TRIAL

Plaintiff, through her undersigned counsel, hereby submits this demand for a jury trial in the captioned action.


_____/S_____
Thomas O'Toole